OPINION OF THE COURT
CHAGARES, Circuit Judge,
with whom McKEE, Chief Judge, SLOVITER, AMBRO, FUENTES, SMITH, HARDIMAN, and GREENAWAY, JR., Circuit Judges, join.
J.S., a minor, by and through her parents, Terry Snyder and Steven Snyder, individually and on behalf of their daughter, appeal the District Court’s grant of summary judgment in favor of the Blue Mountain School District (“the School District”) and denial of their motion for summary judgment. This case arose when the School District suspended J.S. for creating, on a weekend and on her home computer, a MySpace profile (the “profile”) making fun of her middle school principal, James McGonigle. The profile contained adult language and sexually explicit content. J.S. and her parents sued the School District under 42 U.S.C. § 1983 and state law, alleging that the suspension violated J.S.’s First Amendment free speech rights, that the School District’s policies were unconstitutionally overbroad and vague, that the School District violated the Snyders’ Fourteenth Amendment substantive due process rights to raise their child, and that the School District acted outside of its authority in punishing J.S. for out-of-school speech.
Because J.S. was suspended from school for speech that indisputably caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school, the School District’s actions violated J.S.’s First Amendment free speech rights. We will accordingly reverse and remand that aspect of the District Court’s judgment. However, we will affirm the District Court’s judgment that the School District’s policies were not overbroad or void-for-vagueness, and that the School District did not violate the Snyders’ Fourteenth Amendment substantive due process rights.
I.
J.S. was an Honor Roll eighth grade student who had never been disciplined in school until December 2006 and February 2007, when she was twice disciplined for dress code violations by McGonigle. On Sunday, March 18, 2007, J.S. and her friend K.L., another eighth grade student at Blue Mountain Middle School, created a fake profile of McGonigle, which they posted on MySpace, a social networking website. The profile was created at J.S.’s home, on a computer belonging to J.S.’s parents.
The profile did not identify McGonigle by name, school, or location, though it did contain his official photograph from the School District’s website. The profile was presented as a self-portrayal of a bisexual Alabama middle school principal named “M-Hoe.” The profile contained crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and shameful personal attacks aimed at the principal and his family. For instance, the profile lists M-Hoe’s general interests as: “detention, being a tight ass, riding the fraintrain, spending time with my child (who looks like a gorilla), baseball, my golden pen, fucking in my office, hitting on students and their parents.” Appendix *921 (“App.”) 38. In addition, the profile stated in the “About me” section:
HELLO CHILDREN^] yes. it’s your oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick PRINCIPAL^] I have come to myspace so i can pervert the minds of other principal’s [sic] to be just like me. I know, I know, you’re all thrilled[.] Another reason I came to myspace is because — I am keeping an eye on you students (who[m] I care for so much)[.] For those who want to be my friend, and aren’t in my school[,] I love children, sex (any kind), dogs, long walks on the beach, tv, being a dick head, and last but not least my darling wife who looks like a man (who satisfies my needs) MY FRAINTRAIN....
Id. Though disturbing, the record indicates that the profile was so outrageous that no one took its content seriously. J.S. testified that she intended the profile to be a joke between herself and her friends. At her deposition, she testified that she created the profile because she thought it was “comical” insofar as it was so “outrageous.” App. 190.
Initially, the profile could be viewed in full by anyone who knew the URL (or address) or who otherwise found the profile by searching MySpace for a term it contained. The following day, however, J.S. made the profile “private” after several students approached her at school, generally to say that they thought the profile was funny. App. 194. By making the profile “private,” J.S. limited access to the profile to people whom she and K.L. invited to be a MySpace “friend.” J.S. and K.L. granted “friend” status to about twenty-two School District students.
The School District’s computers block access to MySpace, so no Blue Mountain student was ever able to view the profile from school. McGonigle first learned about the profile on Tuesday, March 20, 2007, from a student who was in his office to discuss an unrelated incident. McGonigle asked this student to attempt to find out who had created the profile. He also attempted — unsuccessfully—to find the profile himself, even contacting MySpace directly.
At the end of the school day on Tuesday, the student who initially told McGonigle about the profile reported to him that it had been created by J.S. McGonigle asked this student to bring him a printout of the profile to school the next day, which she did. It is undisputed that the only printout of the profile that was ever brought to school was one brought at McGonigle’s specific request.
On Wednesday, March 21, 2007, McGonigle showed the profile to Superintendent Joyce Romberger and the Director of Technology, Susan Schneider-Morgan. The three met for about fifteen minutes to discuss the profile. McGonigle also showed the profile to two guidance counselors, Michelle Guers and Debra Frain (McGonigle’s wife). McGonigle contacted MySpace to attempt to discover what computer had been used to create the profile, but MySpace refused to release that information without a court order. The School District points to no evidence that anyone ever suspected the information in the profile to be true.
McGonigle ultimately decided that the creation of the profile was a Level Four Infraction under the Disciplinary Code of Blue Mountain Middle School, Student-Parent Handbook, App. 65-66, as a false accusation about a staff member of the school and a “copyright” violation of the computer use policy, for using McGonigle’s photograph. At his deposition, however, McGonigle admitted that he believed the students “weren’t accusing me. They *922 were pretending they were me.” App. 327.[1]
J.S. was absent from school on Wednesday, the day McGonigle obtained a copy of the profile. When she returned, on Thursday, March 22, 2007, McGonigle summoned J.S. and K.L. to his office to meet with him and Guidance Counselor Guers. J.S. initially denied creating the profile, but then admitted her role. McGonigle told J.S. and K.L. that he was upset and angry, and threatened the children and their families with legal action. App. 333-34. Following this meeting, J.S. and K.L. remained in McGonigle’s office while he contacted their parents and waited for them to come to school.
McGonigle met with J.S. and her mother Terry Snyder and showed Mrs. Snyder the profile. He told the children’s parents that J.S. and K.L. would receive ten days out-of-school suspension, which also prohibited attendance at school dances. McGonigle also threatened legal action. J.S. and her mother both apologized to McGonigle, and J.S. subsequently wrote a letter of apology to McGonigle and his wife.
McGonigle next contacted MySpace, provided the URL for the profile and requested its removal, which was done. McGonigle also contacted Superintendent Romberger to inform her of his decision regarding J.S. and KL.’s punishment. Although Romberger could have overruled McGonigle’s decision, she agreed with the punishment. On Friday, March 23, 2007, McGonigle sent J.S.’s parents a disciplinary notice, which stated that J.S. had been suspended for ten days.[2] The following week, Romberger declined Mrs. Snyder’s request to overrule the suspension.
On the same day McGonigle met with J.S. and her mother, he contacted the local police and asked about the possibility of pressing criminal charges against the students. The local police referred McGonigle to the state police, who informed him that he could press harassment charges, but that the charges would likely be dropped. McGonigle chose not to press charges. An officer did, however, complete a formal report and asked McGonigle whether he wanted the state police to call the students and their parents to the police station to let them know how serious the situation was. McGonigle asked the officer to do this, and on Friday, March 23, J.S. and K.L. and their mothers were summoned to the state police station to discuss the profile.
The School District asserted that the profile disrupted school in the following ways. There were general “rumblings” in the school regarding the profile. More specifically, on Tuesday, March 20, McGonigle was approached by two teachers who informed him that students were discussing the profile in class. App. 322. Randy Nunemacher, a Middle School math teacher, experienced a disruption in his class when six or seven students were talking and discussing the profile; Nunemacher had to tell the students to stop talking three times, and raised his voice on the third occasion. App. 368-73. The exchange lasted about five or six minutes. App. 371. Nunemacher also testified that *923 he heard two students talking about the profile in his class on another day, but they stopped when he told them to get back to work. App. 373-74. Nunemacher admitted that the talking in class was not a unique incident and that he had to tell his students to stop talking about various topics about once a week. Another teacher, Angela Werner, testified that she was approached by a group of eighth grade girls at the end of her Skills for Adolescents course to report the profile. App. 415-16. Werner said this did not disrupt her class because the girls spoke with her during the portion of the class when students were permitted to work independently. App. 417-18.
The School District also alleged disruption to Counselor Frain’s job activities. Frain canceled a small number of student counseling appointments to supervise student testing on the morning that McGonigle met with J.S., K.L., and their parents. Counselor Guers was originally scheduled to supervise the student testing, but was asked by McGonigle to sit in on the meetings, so Frain filled in for Guers. This substitution lasted about twenty-five to thirty minutes. There is no evidence that Frain was unable to reschedule the canceled student appointments, and the students who were to meet with her remained in their regular classes. App. 352-53.
On March 28, 2007, J.S. and her parents filed this action against the School District, Superintendent Romberger, and Principal McGonigle. By way of stipulation, on January 7, 2008, all claims against Romberger and McGonigle were dismissed, and only the School District remained as a defendant. After discovery, both parties moved for summary judgment.
After analyzing the above facts, the District Court granted the School District’s summary judgment motion on all claims, though specifically acknowledging that Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), does not govern this case because no “substantial and material disruption” occurred. App. 10-12 (refusing to rely on Tinker)-, App. 17 (concluding that “a substantial disruption so as to fall under Tinker did not occur”). Instead, the District Court drew a distinction between political speech at issue in Tinker, and “vulgar and offensive” speech at issue in a subsequent school speech case, Bethel School District v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). App. 11-12. The District Court also noted the Supreme Court’s most recent school speech decision, Morse v. Frederick, 551 U.S. 393,127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), where the Court allowed a school district to prohibit a banner promoting illegal drug use at a school-sponsored event.
Applying a variation of the Fraser and Morse standard, the District Court held that “as vulgar, lewd, and potentially illegal speech that had an effect on campus, we find that the school did not violate the plaintiffs rights in punishing her for it even though it arguably did not cause a substantial disruption of the school.” App. 15-16. The Court asserted that the facts of this case established a connection between off-campus action and on-campus effect, and thus justified punishment, because: (1) the website was about the school’s principal; (2) the intended audience was the student body; (3) a paper copy was brought into the school and the website was discussed in school; (4) the picture on the profile was appropriated from the School District’s website; (5) J.S. created the profile out of anger at the principal for disciplining her for dress code violations in the past; (6) J.S. lied in school to the principal about creating the profile; (7) “although a substantial disruption so *924 as to fall under Tinker did not occur ... there was in fact some disruption during school hours”; and (8) the profile was viewed at least by the principal at school. App. 17 (emphasis added).
The District Court then rejected several other district court decisions where the courts did not allow schools to punish speech that occurred off campus, including the decision in Layshock v. Hermitage School District, 496 F.Supp.2d 587 (W.D.Pa.2007), a case substantially similar to the one before us, and which is also being considered by this Court. See App. 18-20. In distinguishing these cases, the District Court made several qualitative judgments about the speech involved in each. See, e.g., App. 18 (asserting that the statements in Flaherty v. Keystone Oaks School District, 247 F.Supp.2d 698 (W.D.Pa.2003), were “rather innocuous compared to the offensive and vulgar statements made by J.S. in the present case”); App. 19 (contending that “[t]he speech in the’ instant case ... is distinguishable” from the speech in Killion v. Franklin Regional School District, 136 F.Supp.2d 446 (W.D.Pa.2001), because of, inter alia, “the level of vulgarity that was present” in the instant case); App. 20 (claiming that, as compared to Layshock, “the facts of our case include a much more vulgar and offensive profile”).
Ultimately, the District Court held that although J.S.’s profile did not cause a “substantial and material” disruption under Tinker, the School District’s punishment was constitutionally permissible because the profile was “vulgar and offensive” under Fraser and J.S.’s off-campus conduct had an “effect” at the school. In a footnote, the District Court also noted that “the protections provided under Tinker do not apply to speech that invades the rights of others.” App. 16 n.4 (citing Tinker, 393 U.S. at 513, 89 S.Ct. 733).
Next, the District Court held that the School District’s policies were not vague and overbroad. The District Court first approached the issue in a somewhat backwards manner: it concluded that because the punishment was appropriate under the First Amendment, the policies were not vague and overbroad even though they can be read to apply to off-campus conduct. App. 21. Alternatively, the District Court held that the policy language was “sufficiently narrow ... to confine the policy to school grounds and school-related activities.” Id. (quoting the Handbook, which provides that the “[mjaintenance of order applies during those times when students are under the direct control and supervision of school district officials,” and noting that the computer use policy incorporates the limitations of the Handbook).
The District Court also held that the School District did not violate the Snyders’ parental rights under the Fourteenth Amendment. The Court concluded that “the school did not err in disciplining J.S., and her actions were not merely personal home activities[,]” and that therefore the Snyders’ parental rights were not violated. The Court did not address directly the plaintiffs’ state law argument, but did note that Pennsylvania law allows school districts to “punish students [] ‘during such times as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.’ ” App. 22 (quoting 24 Pa.Stat.Ann. § 5-510). J.S. and her parents filed a timely appeal from the District Court’s entry of summary judgment in favor of the School District and from its decision to deny their motion for summary judgment.
*925 II.
The District Court had jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4), and exercised supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367. We exercise jurisdiction under 28 U.S.C. § 1291.
We review a District Court’s disposition of a summary judgment motion de novo. Pichler v. UNITE, 542 F.3d 380, 385 (3d Cir.2008) (citing Marten v. Godwin, 499 F.3d 290, 295 (3d Cir.2007)). In conducting this review, we use the same standard as the District Court should have applied. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir.2000). “The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a) (setting forth the legal standard formerly found in Fed.R.Civ.P. 56(c)). All inferences must be viewed in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Farrell, 206 F.3d at 278, and where, as was the case here, the District Court considers cross-motions for summary judgment “the court construes facts and draws inferences ‘in favor of the party against whom the motion under consideration is made,’ ” Pichler, 542 F.3d at 386 (quoting Samuelson v. LaPorte Cmty. Sch. Corp., 526 F.3d 1046,1051 (7th Cir.2008)).
“A disputed fact is ‘material’ if it would affect the outcome of the suit as determined by the substantive law.” Gray v. York Neivspapers, Inc., 957 F.2d 1070, 1078 (3d Cir.1992). Importantly, the non-moving party cannot satisfy its requirement of establishing a genuine dispute of fact merely by pointing to unsupported allegations found in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the party must raise more than “some metaphysical doubt,” Matsushita, 475 U.S. at 586, 106 S.Ct. 1348, and the court must determine that “a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770-71 (3d Cir. 2009). It is impermissible for the court to intrude upon the duties of the fact-finder by weighing the evidence or making credibility determinations. Pichler, 542 F.3d at 386. Finally, when the nonmoving party is the plaintiff, he must produce sufficient evidence to establish every element that he will be required to prove at trial. Celotex, 477 U.S. at 322,106 S.Ct. 2548.
III.
Although the precise issue before this Court is one of first impression, the Supreme Court and this Court have analyzed the extent to which school officials can regulate student speech in several thorough opinions that compel the conclusion that the School District violated J.S.’s First Amendment free speech rights when it suspended her for speech that caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school.
A.
We begin our analysis by recognizing the “comprehensive authority” of teachers and other public school officials. Tinker, 393 U.S. at 507, 89 S.Ct. 733. See generally Vemonia Sch. Dist. I7J v. Acton, 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (describing the public schools’ power over public school children *926 as both “custodial and tutelary”). Those officials involved in the educational process perform “important, delicate, and highly discretionary functions.” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). As a result, federal courts generally exercise restraint when considering issues within the purview of public school officials. See Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico, 457 U.S. 853, 864, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (“[Federal courts should not ordinarily ‘intervene in the resolution of conflicts which arise in the daily operation of school systems.’ ” (quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968))); see also Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (“[T]he education of the Nation’s youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.”).
The authority of public school officials is not boundless, however. The First Amendment unquestionably protects the free speech rights of students in public school. Morse, 551 U.S. at 396, 127 S.Ct. 2618 (“Our cases make clear that students do not ‘shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.’ ” (quoting Tinker, 393 U.S. at 506, 89 S.Ct. 733)). Indeed, “[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.” Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The exercise of First Amendment rights in school, however, has to be “applied in light of the special characteristics of the school environment,” Tinker, 393 U.S. at 506, 89 S.Ct. 733, and thus the constitutional rights of students in public schools “are not automatically coextensive with the rights of adults in other settings,” Fraser, 478 U.S. at 682, 106 S.Ct. 3159. Since Tinker, courts have struggled to strike a balance between safeguarding students’ First Amendment rights and protecting the authority of school administrators to maintain an appropriate learning environment.
The Supreme Court established a basic framework for assessing student free speech claims in Tinker, and we will assume, without deciding, that Tinker applies to J.S.’s speech in this case.[3] The Court in Tinker held that “to justify prohibition of a particular expression of opinion,” school officials must demonstrate that “the forbidden conduct would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.” Tinker, 393 U.S. at 509, 89 S.Ct. 733 (emphasis added) (quotation marks omitted). This burden cannot be met if school officials are driven by “a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.” Id. Moreover, “Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance.” Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 211 (3d Cir.2001). Although Tinker dealt with political speech, the opinion has never been confined to such speech. See id. at 215-17 (holding that the school’s anti-harassment policy was overbroad because it “appears to cover substantially more speech than could be prohibited under Tinker[1] s substantial disruption test”); see also Killion, 136 F.Supp.2d at 455-58 *927 (holding that the school overstepped its constitutional bounds under Tinker when it suspended a student for making “lewd” comments about the school’s athletic director in an e-mail the student wrote at home and circulated to the non-school email accounts of several classmates).
As this Court has emphasized, with then-judge Alito writing for the majority, Tinker sets the general rule for regulating school speech, and that rule is subject to several narrow exceptions. Saxe, 240 F.3d at 212 (“Since Tinker, the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption.”). The first exception is set out in Fraser, which we interpreted to permit school officials to regulate “ ‘lewd,’ ‘vulgar,’ ‘indecent,’ and ‘plainly offensive’ speech in school.” Id. at 213 (quoting Fraser, 478 U.S. at 683, 685, 106 S.Ct. 3159) (emphasis added); see also Sypniewski v. Warren Hills Reg’l Bd. ofEduc., 307 F.3d 243, 253 (3d Cir.2002) (quoting Saxe’s narrow interpretation of the Fraser exception). The second exception to Tinker is articulated in Hazelwood School District v. Kuhlmeier, which allows school officials to “regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school’s own speech) on the basis of any legitimate pedagogical concern.” Saxe, 240 F.3d at 214.
The Supreme Court recently articulated a third exception to Tinker’s general rule in Morse. Although, prior to this case, we have not had an opportunity to analyze the scope of the Morse exception, the Supreme Court itself emphasized the narrow reach of its decision. In Morse, a school punished a student for unfurling, at a school-sponsored event, a large banner containing a message that could reasonably be interpreted as promoting illegal drug use. 551 U.S. at 396, 127 S.Ct. 2618. The Court emphasized that Morse was a school speech case, because “[t]he event occurred during normal school hours,” was sanctioned by the school “as an approved social event or class trip,” was supervised by teachers and administrators from the school, and involved performances by the school band and cheerleaders. Id. at 400-01, 127 S.Ct. 2618 (quotation marks omitted). The Court then held that “[t]he ‘special characteristics of the school environment,’ Tinker, 393 U.S.[] at 506[ 89 S.Ct. 733], and the governmental interest in stopping student drug abuse ... allow schools to restrict student expression that they reasonably regard as promoting illegal drug use.” Id. at 408, 127 S.Ct. 2618.
Notably, Justice Alito’s concurrence in Morse further emphasizes the narrowness of the Court’s holding, stressing that Morse “stand[s] at the far reaches of what the First Amendment permits.” 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J., concurring). In fact, Justice Alito only joined the Court’s opinion “on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions” than those recognized by the Court in Tinker, Fraser, Kuhlmeier, and Morse. Id. at 422-23,127 S.Ct. 2618. Justice Alito also noted that the Morse decision “does not endorse the broad argument ... that the First Amendment permits public school officials to censor any student speech that interferes with a school’s ‘educational mission.’ This argument can easily be manipulated in dangerous ways, and I would reject it before such abuse occurs.” Id. at 423, 127 S.Ct. 2618 (citations omitted). Moreover, Justice Alito engaged in a detailed discussion distinguishing the role of school authorities from the role of parents, and the school context from the “[o]utside of school” context. Id. at 424-25,127 S.Ct. 2618.
*928 B.
There is no dispute that J.S.’s speech did not cause- a substantial disruption in the school. The School District’s counsel conceded this point at oral argument and the District Court explicitly found that “a substantial disruption so as to fall under Tinker did not occur.” App. at 17. Nonetheless, the School District now argues that it was justified in punishing J.S. under Tinker because of “facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.... ” Tinker, 393 U.S. at 514, 89 S.Ct. 733. Although the burden is on school authorities to meet Tinker[1] s requirements to abridge student First Amendment rights, the School District need not prove with absolute certainty that substantial disruption will occur. Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir.2008) (holding that Tinker does not require “actual disruption to justify a restraint on student speech”); Lowery v. Euverard, 497 F.3d 584, 591-92 (6th Cir.2007) {‘Tinker does not require school officials to wait until the horse has left the barn before closing the door.... [It] does not require certainty, only that the forecast of substantial disruption be reasonable.”); La-Vine v. Blaine Sch. Disk, 257 F.3d 981, 989 (9th Cir.2001) (“Tinker does not require school officials to wait until disruption actually occurs before they may act.”).
The facts in this case do not support the conclusion that a forecast of substantial disruption was reasonable. In Tinker, the Supreme Court held that “our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands [to protest the Vietnam War] would substantially interfere with the work of the school or impinge upon the rights of other students.” 393 U.S. at 509, 89 S.Ct. 733. Given this holding, it is important to consider the record before the Supreme Court in Tinker and compare it to the facts of this case.
The relevant events in Tinker took place in December 1965, the year that over 200,-000 U.S. troops were deployed to Vietnam as part of Operation Rolling Thunder. Justice Black dissented in Tinker, noting that “members of this Court, like all other citizens, know, without being told, that the disputes over the wisdom of the Vietnam war have disrupted and divided this country as few other issues [e]ver have.” Id. at 524, 89 S.Ct. 733 (Black, J., dissenting). In fact, the Tinker majority itself noted the school authorities’ concern about the effect of the protest on friends of a student who was killed in Vietnam. See id. at 509 n. 3, 89 S.Ct. 733. Justice Black also emphasized the following portions of the record:
the [ ] armbands caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, nonprotesting students had better let them alone. There is also evidence that a teacher of mathematics had his lesson period practically ‘wrecked’ chiefly by disputes with [a protesting student] who wore her armband for her ‘demonstration.’
Id. at 517, 89 S.Ct. 733 (Black, J., dissenting). Based on these facts, Justice Black disagreed with the Tinker majority’s holding that the armbands did not cause a substantial disruption in school: “I think the record overwhelmingly shows that the armbands did exactly what the elected school officials and principals foresaw they would, that is, took the students’ minds off their classwork and diverted them to thoughts about the highly emotional subject of the Vietnam war.” Id. at 518, 89 S.Ct. 733; see also id. at 524, 89 S.Ct. 733 (“Of course students, like other people, cannot concentrate on lesser issues when *929 black armbands are being ostentatiously displayed in their presence to call attention to the wounded and dead of the war, some of the wounded and the dead being their friends and neighbors.”).
This was the record in Tinker, and yet the majority in that case held that “the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities,” and thus that the school violated the students’ First Amendment rights. Id. at 514, 89 S.Ct. 733 (emphasis added). Turning to our record, J.S. created the profile as a joke, and she took steps to make it “private” so that access was limited to her and her friends. Although the profile contained McGonigle’s picture from the school’s website, the profile did not identify him by name, school, or location. Moreover, the profile, though indisputably vulgar, was so juvenile and nonsensical that no reasonable person could take its content seriously, and the record clearly demonstrates that no one did.[4] Also, the School District’s computers block access to MySpace, so no Blue Mountain student was ever able to view the profile from school.[5] And, the only printout of the profile that was ever brought to school was one that was brought at McGonigle’s express request. Thus, beyond general rumblings, a few minutes of talking in class, and some officials rearranging their schedules to assist McGonigle in dealing with the profile, no disruptions occurred.[6]
In comparing our record to the record in Tinker, this Court cannot apply Tinkers holding to justify the School District’s actions in this case. As the Supreme Court has admonished, an “undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.” Tinker, 393 U.S. at 508, 89 5.Ct. 733. If Tinker’s black armbands— *930 an ostentatious reminder of the highly emotional and controversial subject of the Vietnam war — could not “reasonably have led school authorities to forecast substantial disruption of or material interference with school activities,” id. at 514, 89 S.Ct. 733, neither can J.S.’s profile, despite the unfortunate humiliation it caused for McGonigle.[7]
Courts must determine when an “undifferentiated fear or apprehension of disturbance” transforms into a reasonable forecast that a substantial disruption or material interference will occur. The School District cites several cases where courts held that a forecast of substantial and material disruption was reasonable. See, e.g., Doninger, 527 F.3d at 50-51 (holding that punishment was justified, under Tinker, where a student’s derogatory blog about the school was “purposely designed by [the student] to come onto the campus,” to “encourage others to contact the administration,” and where the blog contained “at best misleading and at worst false information” that the school “need[ed] to correct” (quotation marks and alteration omitted)); Lowery, 497 F.3d at 596 (holding that punishment was justified, under Tinker, where students circulated a petition to fellow football players calling for the ouster of their football coach, causing the school to have to call a team meeting to ensure “team unity,” and where not doing so “would have been a grave disservice to the other players on the team”); LaVine, 257 F.3d at 984, 989-90 (holding that the school district did not violate a student’s First Amendment rights when it expelled him on an emergency basis “to prevent [ ] potential violence on campus” after he showed a poem entitled “Last Words” to his English teacher, which was “filled with imagery of violent death and suicide” and could “be interpreted as a portent of future violence, of the shooting of [] fellow students”).
The School District likens this case to the above cases by contending that the profile was accusatory and aroused suspicions among the school community about McGonigle’s character because of the profile’s references to his engaging in sexual misconduct. As explained above, however, this contention is simply not supported by the record. The profile was so outrageous that no one could have taken it seriously, and no one did. Thus, it was clearly not reasonably foreseeable that J.S.’s speech would create a substantial disruption or material interference in school, and this case is therefore distinguishable from the student speech at issue in Doninger, Lowery, and LaVine.
Moreover, unlike the students in Doninger, Lowery, and LaVine, J.S. did not even intend for the speech to reach the school — in fact, she took specific steps to make the profile “private” so that only her friends could access it. The fact that her friends happen to be Blue Mountain Middle School students is not surprising, and does not mean that J.S.’s speech targeted *931 the school. Finally, any suggestion that, absent McGonigle’s actions, a substantial disruption would have occurred, is directly undermined by the record. If anything, McGonigle’s response to the profile exacerbated rather than contained the disruption in the school.[8]
The facts simply do not support the conclusion that the School District could have reasonably forecasted a substantial disruption of or material interference with the school as a result of J.S.’s profile. Under Tinker, therefore, the School District violated J.S.’s First Amendment free speech rights when it suspended her for creating the profile.[9]
C.
Because Tinker does not justify the School District’s suspension of J.S., the *932 only way for the punishment to pass constitutional muster is if we accept the School District’s argument — and the District Court’s holding — that J.S.’s speech can be prohibited under the Fraser exception to Tinker.[10] The School District argues that although J.S.’s speech occurred off campus, it was justified in disciplining her because it was “lewd, vulgar, and offensive [and] had an effect on the school and the educational mission of the District.” School District Br. 7. The School District’s argument fails at the outset because Fraser does not apply to off-campus speech. Specifically in Morse, Chief Justice Roberts, writing for the majority, emphasized that “[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected.” 551 U.S. at 405,127 S.Ct. 2618 (citing Cohen v. Cal, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)).[11] The Court’s citation to the Cohen decision is noteworthy. The Supreme Court in Cohen held, in a non-school setting, that a state may not make a “single four-letter expletive a criminal offense.” 403 U.S. at 26, 91 S.Ct. 1780. Accordingly, Chief Justice Roberts’s reliance on the Cohen decision reaffirms that a student’s free speech rights outside the school context are coextensive with the rights of an adult.
Thus, under the Supreme Court’s precedent, the Fraser exception to Tinker does not apply here. In other words, Fraser’s “lewdness” standard cannot be extended to justify a school’s punishment of J.S. for use of profane language outside the school, during non-school hours.[12]
The School District points out that “a hard copy or printout of the profile actually came into the school.” School District Br. 22. However, the fact that McGonigle caused a copy of the profile to be brought to school does not transform J.S.’s off-campus speech into school speech. The flaws of a contrary rule can be illustrated by extrapolating from the facts of Fraser itself. As discussed above, the Supreme Court emphasized that Fraser’s speech would have been protected had he delivered it outside the school. Presumably, this protection would not be lifted if a school official or Fraser’s fellow *933 classmate overheard the off-campus speech, recorded it, and played it to the school principal.[13] Similarly here, the fact that another student printed J.S.’s profile and brought it to school at the express request of McGonigle does not turn J.S.’s off-campus speech into on-campus speech.
Under these circumstances, to apply the Fraser standard to justify the School District’s punishment of J.S.’s speech would be to adopt a rule that allows school officials to punish any speech by a student that takes place anywhere, at any time, as long as it is about the school or a school official, is brought to the attention of a school official, and is deemed “offensive” by the prevailing authority. Under this standard, two students can be punished for using a vulgar remark to speak about their teacher at a private party, if another student overhears the remark, reports it to the school authorities, and the school authorities find the remark “offensive.” There is no principled way to distinguish this hypothetical from the facts of the instant case.
Accordingly, we conclude that the Fraser decision did not give the School District the authority to punish J.S. for her off-campus speech.
V íjí V *1* V
Neither the Supreme Court nor this Court has ever allowed schools to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school. We follow the logic and letter of these cases and reverse the District Court’s grant of summary judgment in favor of the School District and denial of J.S.’s motion for summary judgment on her free speech claim. An opposite holding would significantly broaden school districts’ authority over student speech and would vest school officials with dangerously overbroad censorship discretion. We will remand to the District Court to determine appropriate relief on this claim.
IV.
We next turn to the argument of J.S.’s parents that the School District violated their Fourteenth Amendment due process right to raise their child in the manner that they saw fit. Specifically, they argue that, in disciplining J.S. for conduct that occurred in her parents’ home during non-school hours, the School District interfered with their parental rights.
As the Supreme Court has noted, “it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.” Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This liberty interest, however, is not absolute, Anspach v. City of Phila., 503 F.3d 256, 261 (3d Cir.2007), and “there may be circumstances in which school authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents,” Gruenke v. Seip, 225 F.3d 290, 304 (3d Cir.2000). Should the school policies conflict with the parents’ liberty interest, the policies may only prevail if they are “tied to a compelling interest.” Id. at 305.
A conflict with the parents’ liberty interest will not be lightly found, and, *934 indeed, only occurs when there is some “manipulative, coercive, or restraining conduct by the State.” Anspach, 503 F.3d at 266. In other words, the parents’ liberty interest will only be implicated if the state’s action “deprived them of their right to make decisions concerning their child,” and not when the action merely “complicated the making and implementation of those decisions.” C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 184 (3d Cir.2005). On the other hand, however, the level of interference required to find a conflict between the school district’s policy and the parents’ liberty interest may vary depending on the significance of the subject at issue, and the threshold for finding a conflict will not be as high when the school district’s actions “strike at the heart of parental decision-making authority on matters of the greatest importance.” Id.
In this case, J.S.’s parents allege that the School District interfered with their ability to determine what out-of-school behavior warranted discipline and what form that discipline took. This, however, is not an accurate description of the impact that the School District’s actions had upon J.S.’s parents’ ability to make decisions concerning their daughter’s upbringing. The School District’s actions in no way forced or prevented J.S.’s parents from reaching their own disciplinary decision, nor did its actions force her parents to approve or disapprove of her conduct. Further, there was no triggering of the parents’ liberty interest due to the subject matter of the School District’s involvement; a decision involving a child’s use of social media on the internet is not a “mat-tern of the greatest importance.” Compare C.N., 430 F.3d at 184-85 (determining that no due process violation occurred when a school, without first receiving permission from parents, distributed surveys to students that included questions about sexual activity and substance abuse), with Gruenke, 225 F.3d at 306-07 (finding a due process violation when a school coach did not inform a student’s parents of their daughter’s positive pregnancy test). Under these circumstances, we cannot find that J.S.’s parents’ liberty interest was implicated, and will affirm the District Court’s grant of summary judgment on their Fourteenth Amendment due process claim.
V.
Finally, J.S. challenges the Blue Mountain Studenb-Parent Handbook (“Handbook”) and the Acceptable Use of the Computers, Network, Internet, Electronic Communications System and Information Policy (“AUP”) as unconstitutionally overbroad and vague. Relying largely on the testimony of McGonigle and Romberger, J.S. encourages this Court to strike down these School District policies.
“A regulation is unconstitutional on its face on overbreadth grounds where there is [] ‘a likelihood that the statute’s very existence will inhibit free expression’ by ‘inhibiting the speech of third parties who are not before the Court.’ ” Saxe, 240 F.3d at 214 (quoting Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). “[T]he over-breadth doctrine is not casually employed,” Sypniewski, 307 F.3d at 258 (quoting L.A. Police Dep’t v. United Reporting Publ’g Corp., 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999)), and before concluding that a law is unconstitutionally overbroad, the court must first determine that the regulation is not “susceptible to a reasonable limiting construction,” Saxe, 240 F.3d at 215. Further, a law will only be struck down as overbroad if the overbreadth is “not only real but substantial in relation to the statute’s plainly legitimate sweep.” *935 Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In undertaking this analysis in the public school setting, however, it is important to recognize that the school district may permissibly regulate a broader range of speech than could be regulated for the general public, giving school regulations a larger plainly legitimate sweep. Sypniewsk% 307 F.3d at 259. Due to this consideration and concerns about the responsibilities with which public schools are tasked, we have adopted a “more hesitant application,” id. at 259, of the overbreadth doctrine within public schools. Accordingly, “a school disciplinary policy will be struck down as overbroad only after consideration of the special needs of school discipline has been brought to bear together with the law’s general hesitation to apply this ‘strong medicine.’ ” Id. at 260.
J.S.’s argument that the School District’s policies are overbroad in that they reach out-of-school speech fails on factual grounds, as the policies are explicitly limited to in-school speech. The Handbook states that the authority of the principals and teachers within the District is limited to “those times when students are under the direct control and supervision of school district officials.” App. 58. In addition, the specific policy on computer usage in the Handbook states that “[sjtudents may not create, copy, receive, or use data, language or graphics which are obscene, threatening, abusive, or otherwise inappropriate at school or on sign out equipment at home.” App. 61. The AUP is similarly limited in scope, and defines “computer” as
any school district owned, leased or licensed or employee, student and guest owned personal hardware, software or other technology used on school district premises or at school district events, or connected to the school district network, containing school district programs or school district or student data ... attached or connected to, installed in, or otherwise used in connection with a computer.
App. 40. We need not give these regulations a limiting construction, therefore, as the School District has already limited the reach of its policies.
What J.S. challenges here is not the policies themselves, but the interpretation of these policies that allows the School District to apply its regulations beyond the times when she was within the direct control and supervision of the School District, or beyond times when she was using a school computer. The misinterpretation of these policies by specific individuals, however, does not make the policies overbroad. Although the Handbook and AUP can be applied in a way that violates a student’s constitutional rights, as happened in this case, the regulations themselves are not constitutionally infirm on the basis of being overbroad. For this reason, we will affirm the District Court’s grant of summary judgment on this issue.
Our vagueness inquiry is grounded in the notice requirement of the Fourteenth Amendment’s due process clause. City of Chicago v. Morales, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). A statute will be considered void for vagueness if it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement. Hill v. Colorado, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). This standard, however, is more relaxed in the school environment: “Given the school’s need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.” Fraser, 478 U.S. at 686, 106 S.Ct. *936 3159. This Court has declared that school disciplinary rules should be struck down “only when the vagueness is especially problematic,” Sypniewski, 307 F.3d at 266, and has upheld a school disciplinary policy that required students to conform to “ ‘an imprecise but comprehensible normative standard,’ ” id. (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)).
Again, we will affirm the District Court’s determination that the School District’s policies were not facially unconstitutional. The policies clearly define when and where they apply. Further, the content of the regulations is not impermissibly vague. Although the AUP prohibits a broad range of uses of the School District’s computers (including accessing or transmitting “material likely to be offensive or objectionable to recipients,” App. 47), the addition of specific examples of impermissible usages draws this policy within the purview of Sypniewski, and articulates a comprehensible normative standard. For example, under the general prohibition against offensive material, the AUP specifically prohibits defamatory, sexually explicit, discriminatory, and violent material. App. 47-48. There can be no doubt that J.S. would have expected to have been punished under the Handbook and the AUP had she taken the same actions from a school computer or while on school grounds. In this sense, they establish a comprehensible normative standard that is appropriate for use in disciplining student misconduct.
As with the discussion of overbreadth above, J.S.’s argument seems to rely on specific individuals’ misinterpretations of the policies, and not the invalidity of the policies themselves. It was the extension and application of these policies to speech undertaken from her personal computer at her parents’ home to which she objects here. This punishment, however, was not allowed by the vagueness of the policies. Instead, it was implemented despite the fact that these policies quite clearly did not extend to the conduct at issue. As the policies are not unconstitutionally vague, much less vague in a manner that is “especially problematic,” we will affirm the District Court’s grant of summary judgment on this issue.
VI.
For the foregoing reasons, the District Court’s judgment will be affirmed in part, reversed in part and remanded.

. In addition, Romberger testified as to her knowledge that it was actually K.L. and not J.S. who appropriated McGonigle’s photograph from the School District's website. App. 305-06. Further, it was not until March 29, 2007 that the School District placed a warning on its website prohibiting the duplication of photographs or other content from the website. See App. 79, 180.

. McGonigle testified that the other times he imposed a ten-day suspension were when students brought to school a knife, razor, alcohol, and marijuana. App. 317.

. The appellants argue that the First Amendment "limits school official[s’] ability to sanction student speech to the schoolhouse itself." Appellants' Br. 25. While this argument has some appeal, we need not address it to hold that the School District violated J.S.'s First Amendment free speech rights.

. Indeed, although Superintendent Romberger had a duty to report allegations of inappropriate sexual contact or other misconduct by officials in the School District, she did not report McGonigle, because she believed the content of the profile was not true. App. 295-307. In fact, Romberger did not even question McGonigle as to whether any of the content was true. App. 307.

. We agree with the appellants' argument that 24 Pa.Stat.Ann. § 5-510 also barred the School District from punishing J.S. for her off-campus speech. Section 5-510 limited the authority of the School District to:
adopting] and enforcing] such reasonable rules and regulations ... regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.
24 Pa.Stat.Ann. § 5-510 (emphasis added). The dissent notes that § 5-510 permits a school district to exercise "such control as is necessary to prevent infractions of discipline and interference with the educational process.” D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Dirs., 868 A.2d 28, 36 (Pa. Commw.Ct.2004). While that may be true, the Pennsylvania Commonwealth Court has interpreted this provision to prohibit a school district from punishing students for conduct occurring outside of school hours — even if such conduct occurs on school property. See id. at 35-36.
All of the integral events in this case occurred outside the school, during non-school hours. Accordingly, § 5-510 also barred the School District from punishing J.S.

. McGonigle testified that after this lawsuit was filed, there was a general decline in student discipline and that he believed this litigation itself encouraged other students to misbehave because they thought they could simply file a lawsuit to alleviate any trouble. App. 350-51. McGonigle’s testimony in this regard is irrelevant to the issues before this Court because these disruptions did not arise out of the creation of the profile itself, but rather, were the direct result of the School District's response to the profile and the ensuing litigation. This testimony, therefore, is not relevant to determining the level of disruption that the profile caused in the school.

. We recognize that vulgar and offensive speech such as that employed in this case— even made in jest — could damage the careers of teachers and administrators and we conclude only that the punitive action taken by the School District violated the First Amendment free speech rights of J.S.
To the extent the dissent supports its arguments regarding material and substantial disruption by speculating about the possibility of discomfort by the recipients of the speech in this case, we cite then-Judge Alito’s admonition in Saxe that "[t]he Supreme Court has held time and time again, both within and outside of the school context, that the mere fact that someone might take offense at the content of the speech is not sufficient justification for prohibiting it.” 240 F.3d at 215; see also Tinker, 393 U.S. at 509, 89 S.Ct. 733 (holding school officials cannot prohibit student speech based upon the desire to avoid "discomfort and unpleasantness”).

. The dissent concludes that our decision creates a circuit split with the Court of Appeals for the Second Circuit, positing that that court has determined "that off-campus hostile and offensive student internet speech that is directed at school officials results in a substantial disruption of the classroom environment.” Dissenting Op. 950. We disagree, largely because the dissent has overstated our sister circuit's law. Each case applying Tinker is decided on its own facts, see Doninger, 527 F.3d at 53 ("We decide only that based on the existing record, [the student's] post created a foreseeable risk of substantial disruption to the work and discipline of the school....”), Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 40 (2d Cir.2007) (deciding case "on this record”), so all "off-campus hostile and offensive student internet speech” will not necessarily create a material and substantial disruption at school nor will it reasonably lead school officials to forecast substantial disruption in school. Further, the facts of the cases cited by the dissent in support of its proposition that we have created a circuit split differ considerably from the facts presented in this case. See, e.g., Doninger, 527 F.3d at 50-51; Wisniewski, 494 F.3d at 35 (involving a student "sharing with friends via the Internet a small drawing crudely, but clearly, suggesting that a named teacher should be shot and killed”). Accordingly, we do not perceive any circuit split and will continue to decide each case on its individual facts.

. The School District seizes upon language in Tinker that is arguably dicta, claiming that it was justified in abridging J.S.’s First Amendment rights because the profile defamed McGonigle. School District Br. 28-33. In Tinker, the Court discussed its concern with "the rights of other students to be let alone.” 393 U.S. at 508, 89 S.Ct. 733. As a result, the Court appeared to indicate that school officials could stop conduct that would "impinge upon the rights of other students.” Id. at 509, 89 S.Ct. 733. Later in the opinion, the Court reiterated the point, but referred simply to "invasion of the rights of others.” Id. at 513, 89 S.Ct. 733. Although McGonigle is not a student, the School District claims J.S.’s speech is not immunized by the First Amendment because McGonigle’s right to be free from defamation fits within this language in Tinker. We are not aware of any decisions analyzing whether this language applies to anyone other than "students,” but we do note that our cases have employed both of these clauses. See, e.g., Walker-Serrano ex rel. Walker v. Leonard, 325 F.3d 412, 416-17 (3d Cir.2003); Sypniewski, 307 F.3d at 264, 265; Saxe, 240 F.3d at 214, 217. We further note there is a danger in accepting the School District’s argument: if that portion of Tinker is broadly construed, an assertion of virtually any "rights” could transcend and eviscerate the protections of the First Amendment. See generally Snyder v. Phelps,-U.S.-, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (noting that the First Amendment imposes limitations on the ability to recover in tort). In any event, we agree with J.S. that, as a matter of law, McGonigle could not succeed in his claim that the profile violated his right to be free from defamation. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (holding that a libel claim cannot survive where no reasonable observer can understand the statements to be describing actual facts or events); Wecht v. PG Publ'g Co., 353 Pa.Super. 493, 510 A.2d 769, 774 (1986) ("Even the most inattentive reader would not accept this article as a factual narrative. Considering the totality of the printed material ... we find this publication *932 incapable of defamatory meaning.”); see also Davis v. Monroe County Bd. ofEduc., 526 U.S. 629, 652, 119 S.Ct 1661, 143 L.Ed.2d 839 (1999) (holding "simple acts of teasing and name-calling” are not actionable).

. Indisputably, neither Kuhlmeier nor Morse governs this case.

. Notably, in Morse, Chief Justice Roberts also cited Justice Brennan's concurrence in Fraser, which noted, "[i]f respondent had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate.” Fraser, 478 U.S. at 688, 106 S.Ct. 3159 (Brennan, J., concurring) (citing Cohen, 403 U.S. 15, 91 S.Ct. 1780).

. The School District notes that the courts in Doninger and Bethlehem Area School District suggested that Fraser applies to vulgar off-campus speech. See Doninger, 527 F.3d at 49 ("It is not clear ... [whether] Fraser applies to off-campus speech.”); Bethlehem Area Sch. Dist., 807 A.2d at 867 ("[W]e are not convinced that reliance solely on Tinker is appropriate.”). Not only are these cases not binding on this Court, but also both Doninger and Bethlehem Area School District ultimately relied on Tinker, not Fraser, in upholding school censorship. Thus, the courts' suggestion that the Fraser standard may apply to off-campus speech is dicta. Most importantly, that dicta is undermined directly by Chief Justice Roberts’s statement in Morse: "Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected.” 551 U.S. at 405, 127 S.Ct. 2618 (citing Cohen, 403 U.S. 15, 91 S.Ct. 1780). The most logical reading of Chief Justice Roberts’s statement prevents the application of Fraser to speech that takes place off-campus, during non-school hours, and that is in no way sponsored by the school.

. Note that the question of whether a school has the authority to punish a student who brings vulgar speech into school is separate from whether the school can punish the source of that speech.

. Tinker did say that the substantial-disruption standard governs student speech "in class or out of it.” 393 U.S. at 513, 89 S.Ct. 733. Read in context, though, it is clear that the phrase "or out of it” does not mean "out of school” but rather "in the cafeteria, or on *938 the playing field, or on the campus during the authorized hours.” Id. at 512-13, 89 S.Ct. 733. See also id. at 508, 89 S.Ct. 733 ("Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk....”) (emphasis added). Had the Court intended to vest schools with the unprecedented authority to regulate students’ off-campus speech, surely it would have done so unambiguously.